# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CHERYL EDENFIELD, as mother and
legal guardian of QUINCY
EDENFIELD, an incapacitated
adult,

    Plaintiff,

v.

GATEWAY BEHAVIORAL HEALTH
SERVICES,

    Defendant,

v.

HEALTHCARE STAFFING, INC.,

    Third-Party Defendant.

No. 2:16-cv-170

## ORDER

Before the Court is Defendant Gateway Behavioral Health
Service's ("Gateway") motion for summary judgment,[1] dkt. no. 79,
to which Plaintiff Cheryl Edenfield, in her capacity as the mother
and legal guardian of Quincy Edenfield, filed a response, dkt. no.
83. Also pending before the Court is Gateway's motion to dismiss
for failure to join an indispensable party. Dkt. No. 71. The
motions are ripe for review.

---

[1] Gateway's motion is captioned "Defendant Gateway Behavioral Health Services'
Motion for Judgment on the Pleadings." Dkt. No. 79 at 1. But the content of the
document calls the motion a "Motion for Summary Judgment pursuant to Fed. R.
Civ. P. Rule 56." Id. It is treated as a Motion for Summary Judgment pursuant to
Federal Rule of Civil Procedure 56, per the text of the motion.

**BACKGROUND**

Quincy Edenfield suffers from intellectual disabilities, including severe autism. Dkt. No. 1-3 at 4. In May 2012, with assistance from his mother, Cheryl Edenfield, Quincy sought the resources of Gateway in Hinesville, Georgia. Id.

Gateway is a public agency that provides mental health, developmental disability, and addictive disease treatment to underprivileged residents of Southeast Georgia. Dkt. No. 79-1 at 1. It operates under the control of the Department of Behavioral Health and Developmental Disabilities (DBHDD), a State agency. Id. at 2.

Quincy began to split his time between the care of Gateway and the care of his mother. On the weekends, Quincy stayed with Cheryl Edenfield. Dkt. No. 1-3 at 4. During the week, Quincy lived in Gateway's Liberty Group Homes, along with his three roommates. Id. The home was maintained, in part, with Federal Government subsidies. Dkt. No. 4 at 15. Gateway would pick Quincy up at 8:30 a.m. and take him to its Hinesville facility for behavioral services. See Dkt. No. 1-3 at 4. Gateway would then return Quincy to his home at 2:30 p.m. Id.

In the course of arranging their care relationship, Gateway and Quincy entered into a rental agreement and a transportation agreement. Dkt. No. 4 at 15. Gateway also devised a "Behavioral Support Plan" which included 24/7 in-home supervision, in-home

AO 72A
(Rev. 8/82)

line of sight supervision, off-site supervision, and one-on-one support in the community; the plan also included a guide to ensure the safety of Quincy and others. Dkt. No. 1-3 at 5.

Gateway and Quincy's relationship continued for nearly a year. But sometime around February 2016, Cheryl Edenfield began noticing bruises and wounds on Quincy's body. Id. at 6. Then, on February 27, 2016, Rosetta Scott—an instructor at Gateway—told another Gateway employee that she had seen Errol Wilkins—a Gateway instructor—hitting Quincy. Id. at 7. Gateway quickly launched an investigation into Ms. Scott's allegations. Id. In the course of that investigation, many employees reported having seen Mr. Wilkins hit Quincy. Id. at 7-12.

Cheryl Edenfield[2] (hereinafter "Plaintiff") brought claims against Gateway sounding in torts, contracts, and civil rights. Dkt. No. 1. The tort claims were dismissed based on sovereign immunity, so only two claims remain: the civil rights claim, made pursuant to 42 U.S.C. § 1983, and the contract claim. See Dkt. No. 25.

As to the first claim, Plaintiff argues that Gateway violated Quincy's procedural and substantive due process rights by its failure to protect him from Errol Wilkins's abuse, which Plaintiff asserts was under the color of state law, with Gateway being a

---

[2] Cheryl Edenfield was appointed Quincy's Guardian and Conservator by the Liberty County Probate Court on March 23, 2015. Dkt. No. 1-3 at 4.

State agency. Dkt. No. 103 at 17. Gateway argues it is not a "person" for purposes of a § 1983 action, and, therefore, cannot be sued thereunder. Dkt. No. 79 at 1. As to the second claim—negligent breach of contract—Plaintiff alleges that Gateway failed to provide Quincy with a safe environment pursuant to a written contract between Gateway and Quincy. Dkt. No. 1-3 at 14-15. Gateway argues that no such contract exists, and, therefore, it cannot be held contractually liable. Dkt. No. 85 at 6.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might "affect the outcome of the suit under the governing law." Great Am. Alliance Ins. Co. v. Anderson, 847 F.3d 1327, 1331 (11th Cir. 2017) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence [is] such that a reasonable jury could return a verdict for either party." Id. In making this determination, the court is to view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v.

AO 72A
(Rev. 8/82)

Catrett, 477 U.S. 317, 323 (1986). The movant must demonstrate that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

## DISCUSSION

### I. Gateway's Motion to Dismiss

Toward the end of the discovery period in this case, Gateway filed a motion for leave to file a third-party complaint, in which it sought to add as a defendant Healthcare Staffing, Inc., who Gateway alleges was a joint-employer of Errol Wilkins. Dkt. No. 61. Initially, Plaintiff opposed that motion. Dkt. No. 67. Then, Gateway filed a motion to dismiss for failure to join an indispensable party, i.e. Healthcare Staffing, Inc. Dkt. No. 71. Plaintiff subsequently withdrew her objection to Gateway's motion for leave to file a third-party complaint, dkt. no, 74, and the Magistrate Judge granted Gateway's motion, dkt. nos. 61, 82. Accordingly, Gateway's motion to dismiss for failure to join an indispensable party, dkt. no. 71, is **DENIED as moot**.

### II. Plaintiff's 42 U.S.C. § 1983 Claim

Plaintiff brought a claim against Gateway under 42 U.S.C. § 1983, alleging that Gateway violated Quincy's constitutional rights through its "customs, policies, and officials acts,"

AO 72A
(Rev. 8/82)

including "grossly inadequate" training, control, and supervision of its employees. Dkt. No. 1-3 ¶ 54; see also id. ¶¶ 51-56. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Gateway argues that the claim must fail because Gateway is not a person but rather an "arm of the state" incapable of being sued under § 1983. Dkt. No. 79-1 at 9-10; Dkt. No. 86 at 20-21. Plaintiff, on the other hand, argues that Gateway is not an arm of the state, and that even if it is, Gateway can still be held accountable under § 1983 because it waived any claim to Eleventh Amendment immunity. Dkt. No. 83 at 22, 23.

## A. Section 1983's Relationship with the Eleventh Amendment

In general, the Eleventh Amendment bars suit against a state in federal court. Carr v. City of Florence, Ala., 916 F.2d 1521, 1524 (11th Cir. 1990). Eleventh Amendment immunity extends to State officials and arms of the State. See Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

While the Court's § 1983 analysis is informed by the Eleventh Amendment, the § 1983 analysis is a separate analysis. Will v. Mich. Dep't of State Police, 491 U.S. 58, 66 (1989) (stating that

AO 72A
(Rev. 8/82)

"the scope of the Eleventh Amendment and the scope of § 1983" are "separate issues"). In _Will_, the U.S. Supreme Court squarely decided whether a state was a person under § 1983 in a context where the Eleventh Amendment did not apply. _Id._ at 63-64. There, the petitioner filed a § 1983 action in Michigan state court; the Eleventh Amendment does not apply in state court. _Id._ at 64. After a careful analysis of common usage of the word "person," ordinary rules of statutory construction, the purpose of enacting § 1983, and legislative history, the Court concluded that "a State is not a person within the meaning of § 1983" and, thus, could not be sued thereunder. _Id._ at 64-65. The Court reasoned: "[I]n deciphering congressional intent as to the scope of § 1983, the scope of the Eleventh Amendment is a consideration," _id._ at 66-67, and "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect," _id._ at 66 (citing _Quern v. Jordan_, 440 U.S. 332 (1979)). Through enacting § 1983, "Congress did not provide . . . a federal forum for civil rights claims against States" nor "create a cause of action against States to be brought in state courts." _Id._ In other words, § 1983 does not create a cause of action against states in either state or federal courts. _See id._ Because arms of the State are treated the same as States under § 1983, _see_ _infra_, arms of the State are likewise not subject to suit under § 1983. Accordingly, the threshold question

here is not whether Gateway has Eleventh Amendment immunity but whether Gateway is subject to suit under § 1983.

## B. Whether Gateway is a Person under § 1983 or, rather, an Arm of the State

To prevail on a § 1983 claim, Plaintiff must demonstrate that Quincy was deprived of his constitutional rights and that Gateway was the "person" who "caused [Quincy] to be subjected" to the deprivation. Oklahoma City v. Tuttle, 471 U.S. 808, 817 (1985) (alteration and citation omitted). The United States Supreme Court has made it clear that "neither a state nor its officials acting in their official capacities are 'persons' under § 1983." Will, 491 U.S. at 71. An arm of the State is not a person for § 1983 purposes. Id.; see also Tindol v. Ala. Dep't of Rev., 632 F. App'x 1000, 1001 (11th Cir. 2015) (a state and its agencies are not persons under § 1983). The Court therefore begins its inquiry by determining whether Gateway is an arm of the State in Georgia. "The pertinent inquiry" as to whether an entity is an arm of the State "is not into the nature of a corporation's status in the abstract, but its function or role in a particular context," i.e. "whether and to what extent [the entity is] contractually acting as [a] representative[] of the State." Shands Teaching Hosp. & Clinics, Inc. v. Beech Street Corp., 208 F.3d 1308, 1311 (11th Cir. 2000).

AO 72A
(Rev. 8/82)

We weigh four factors to determine whether Gateway acted as an arm of the State: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003). Whether an entity is an arm of the State is ultimately a question of federal law, see id., but "resolution of these factors depends, in part, on state law," Lightfoot v. Henry County School District, 771 F.3d 764, 768 (11th Cir. 2014). The burden is on Gateway to demonstrate that the Manders factors weigh in its favor. See Miller v. Advantage Behavioral Health Sys., 677 F. App'x 556, 559 (11th Cir. 2017); Manders, at 1331 (Anderson, J., dissenting) ("[T]he proper question is whether the sheriff has carried his burden of proving that he is an arm of the state.").

Here, Plaintiff's § 1983 claim arises from allegedly abusive treatment at the hands of Errol Wilkins: an employee hired, trained, and supervised by Gateway. The Court must therefore determine at the outset whether Gateway acted as an arm of the State in making "hiring and firing decisions in the ordinary course of business" and in conducting training, investigation, and supervision of its employee. Id. at 559.

In denying Defendant's Motion for Judgment on the Pleadings, the Court previously determined that Gateway could be considered a

AO 72A
(Rev. 8/82)

person subject to suit under § 1983. Dkt. No. 25 at 9. The Court allowed this case to proceed to the discovery phase based on the Eleventh Circuit's pronouncement in Miller v. Advantage Behavioral Health Sys., 677 F. App'x at 556. The Miller court determined that Georgia community service boards are *not* arms of the State. Id. at 565-66. As explained below, discovery in this case has revealed that Gateway is unlike a typical community service board, so much so that Gateway falls outside the purview of the Miller holding.

### i. Georgia Law's Definition of Community Service Boards

The first Manders inquiry pertains to how Georgia law conceptualizes community service boards ("CSBs") like Gateway.

The Eleventh Circuit recently answered this question. In Miller, after examining the status of similar CSBs, the Eleventh Circuit determined that Georgia law views CSBs as arms of the State. 677 F. App'x at 560. As a CSB, Gateway is considered a public agency under Georgia law. But this is not the end of the inquiry—designating CSBs as arms of the state only "tip[s] the balance toward a finding that Georgia state law views CSBs [like Gateway] as arms of the State." Id.

### ii. State Control Over Gateway

"The second Manders factor requires us to determine the degree of control the State maintains over the activity from which the defendant's alleged liability arises." Id. CSBs in Georgia are

AO 72A
(Rev. 8/82)

typically "managed at the local level and without significant state involvement." Id. at 561. Each CSB's operation is controlled by a local governing board, consisting of members appointed by the governing authorities of the counties the CSB serves. See O.C.G.A. § 37-2-6(b). The governing board is authorized to both appoint an executive director and to delegate "any power, authority, duty, or function" to the executive director. Id. § 37-2-6.1(a)(1). In turn, "[t]he executive director . . . directs the day-to-day operations of the [CSB]," id., including hiring and firing of staff, Miller, 677 F. App'x at 561. The State is authorized neither to review hiring and firing decisions nor to train or discipline staff. Id.

Gateway contends that the State's control over its operations is unlike that of a typical CSB. It shows that, before and during the time period at issue, its operations had been taken over by the State. Dkt. No. 79-1 at 4. Gateway argues that the State retains ultimate control over its operations, noting that (1) in 2013, the Governor utilized statutory authority to disband Gateway's Board of Directors, relieving them of their duties; (2) the Commissioner of DBHDD terminated Gateway's CEO; (3) the Commissioner appointed a new manager, who was an employee of DBHDD and answered to DBHDD; and (4) in 2015, the Commissioner appointed a new CEO, who was an employee of DBHDD and answered to DBHDD. Dkt. No. 79-1 at 4-5. So, "from 2013 to the present, all day-to-

day operations and the administration of Gateway BHS has been conducted by the State of Georgia through DBHDD employees." Id. at 5. As such, Gateway argues that—unlike the CSB in Miller—Gateway does not "retain substantial autonomy over day-to-day operations and ordinary personnel management," as a result of the Governor's disbanding of the Board and DBHDD's subsequent and ongoing supervision. Miller, 677 at 561.

Plaintiff argues that just because the State exercised its power to define, investigate, and punish misconduct does not mean that Gateway's day-to-day operations were in fact controlled by the state. "[E]very entity and individual in the State is subject to the control of the State's power to define, investigate, and punish misconduct." Johnson v. Ogeechee Behavioral Health Servs., 479 F. Supp. 2d 1357, 1365 (S.D. Ga. 2007).

The evidence presented clearly established that Gateway is markedly different than the CSB in Miller on this factor because of the State's substantial control over Gateway. Most notably, DBHDD, with the concurrence of the Governor, exercised its power under O.C.G.A. § 37-2-10 to appoint a manager to operate Gateway and to dissolve Gateway's Board. Dkt. No. 79-2 at 2-3. Gateway has operated under the supervision of DBHDD ever since. Dkt. No. 79-2 at 3 ("Gateway BHS has continued to operate under the direction of DBHDD without a board of directors from July 2013 through the present."). Gateway also presented evidence of State control over

AO 72A
(Rev. 8/82)

minute, day-to-day operations. Dkt. No. 79-4 ¶¶ 5-11. For example, the state "control[s] employment/hiring by requiring Gateway BHS to conduct criminal background checks on its employees and submit the results to DBHDD for approval before an employee/contractor may be hired." Id. ¶ 9. Thus, decisions which are typically made by a local governing board "without significant state involvement," Miller, 677 F. App'x at 561, are actually being made by employees of DBHDD. Even taking this evidence in the light most favorable to Plaintiff, it is apparent that the State exercised meaningful control over Gateway. As such, this second Manders factor points toward Gateway being an arm of the State.

### iii. Gateway's Funding

The third Manders factor requires examination of Gateway's funding. "[W]e focus primarily on the quantum of funding the State provides to the defendant entity," Miller, 677 F. App'x at 563, but we also consider the autonomy, if any, created by the funding mechanism, Lightfoot, 771 F.3d at 777. The Eleventh Circuit has held that an entity's mere receipt of "significant funding from the State" is not sufficient for this factor to favor an entity's status as an arm of the State. Id. at 776.

Gateway does, in fact, receive significant funding from the State. The State of Georgia funds the overwhelming majority of Gateway's operations; here, Georgia funded or controlled approximately eighty-eight percent (88%) of Gateway's operational

AO 72A
(Rev. 8/82)

budget. Dkt. No. 79-1 at 13. Approximately fifty-three percent (53%) of Gateway's operating budget is directly from State funds. Id. ¶ 5. Additionally, Gateway's access to Medicaid funding, which makes up another thirty-three percent (33%), is through DBHDD. Id. DBHDD must both approve Gateway as a provider and audit Gateway's compliance with Medicaid funding regulations. Id. In Fiscal Year 2016, the State of Georgia, through DBHDD, provided Gateway $15,756,761.00 in funding. Id.

Moreover, the State of Georgia exercises meaningful control over Gateway's funding. Gateway has provided evidence that the State mandates the source of funding and limits Gateway's spending decisions. Gateway's use of such funds is contingent upon its compliance with DBHDD policies, which govern "every aspect" of its operations, including hiring, safety compliance, incident reporting, and service provision. Dkt. No. 79-1 at 3-4. Gateway cannot issue bonds without the express approval of DBHDD. Dkt. No. 79-4 ¶ 11. DBHDD is responsible for financial auditing of Gateway and has access to all of its facilities and records on demand. Id. ¶ 10. Georgia also exercises control over Gateway's spending. All revenue/fees collected by Gateway must be reinvested in DBHDD-approved services to Gateway's clients. Id. ¶ 6. As such, Gateway has presented the court with sufficient evidence indicating that the State exercises meaningful control

AO 72A
(Rev. 8/82)

over the source of Gateway's funding and the use of those funds. See <u>Miller</u>, 677 F. App'x at 563.

Finally, the structural concerns that have prevented this Court from previously finding that a CSB is an arm of the State as it relates to funding do not exist in this case. Within Georgia's statutory framework, a CSB's board generally has "unfettered discretion to design its own funding mix," and "[t]his level of autonomy precludes the State from dictating [a CSB's] funding portfolio and limits the State's control over [a CSB's] financial decision-making." <u>Id.</u> at 564. In other cases, the role of the Board over "financial decision-making—especially in the arena of personnel management—weighs against" finding an entity an arm of the State. <u>Id.</u> But here, the State of Georgia disbanded the Governing Board and DBHDD employees were appointed as Gateway's CEO and manager; thus, DBHDD remains in control of Gateway's financial decisions. Dkt. No. 79-1 at 4-5.

Even taking this evidence in the light most favorable to Plaintiff, it is apparent that Gateway has met its burden of demonstrating that the State not only provides significant funding to Gateway but also exercises control over such funding sufficient to satisfy the third <u>Manders</u> factor.

### iv. Responsibility for Judgments Against Gateway

The fourth and final <u>Manders</u> factor pertains to responsibility for a judgment against the entity in question. The

Eleventh Circuit has indicated that this factor is especially important, "though not alone determinative," because it "implicates the Eleventh Amendment's core concern that the State will be in fact obligated to bear and pay adverse judgments." Keene v. Prine, 477 F. App'x 575, 579 (11th Cir. 2012) (internal quotation marks and citations omitted). As such, the fourth Manders factor is given "great weight." Id.

Georgia law states that "the liabilities, debts, and obligations of a community service board shall not constitute liabilities, debts, or obligations of the state or any county or municipal corporation and neither the state nor any county or municipal corporation shall be liable for any liability, debt, or obligation of a community service board." O.C.G.A. § 37-2-6(a). This statutory limitation of state liability for any judgment against Gateway weighs against finding it to be an arm of the State. See Miller, 677 F. App'x at 564.

However, the Eleventh Circuit has stated that certain special conditions may arise through which the state treasury is indirectly implicated in the defendant entity's liabilities. These circumstances include where an office is subject to direct state control and is financially dependent on the state. See Manders, 338 F.3d at 1327-28. The Eleventh Circuit has also stated that if the State of Georgia were obligated or incentivized to prop-up a CSB in the event of its financial distress or insolvency, such an

AO 72A
(Rev. 8/82)

incentive would cut in favor of finding it an arm of the state. <u>Miller</u>, 677 F. App'x at 565.

Here, Plaintiff simply argues that "[b]y statute and contract, [Gateway] is wholly liable for any adverse judgment and State coffers are not touched." Dkt. No. 83 at 24 (citing O.C.G.A § 37-2-6 ("[T]he liabilities, debts, and obligations of a community service board shall not constitute liabilities, debts, or obligations of the state . . . and neither the state nor any county or municipal corporation shall be liable for any liability, debt, or obligation of a community service board.")); <u>id.</u> (citing Regional Contract between Gateway and DBHDD, dkt. no. 79-5 ¶ 143, which requires Gateway to obtain and maintain workers compensation insurance, commercial general liability insurance, business auto policy insurance, and commercial umbrella insurance).

Gateway argues that any judgment in this case would result in (1) an actual drain on the state treasury, via a payment of the State's self-insurance funds managed by the Department of Administrative Services, or (2) an indirect drain on state treasury funds as the judgment would be paid by Gateway's state-funded operating budget. Dkt. No. 79-1 at 14. The evidence shows that payment would reduce Gateway's budget, the great majority of which is comprised of State funds. <u>See</u> Dkt. No. 79-2 ¶ 24 (stating that a "judgment would be paid by Gateway BHS from Gateway BHS's operating budget"); 79-4 ¶ 13 (same). Second, the State would have

the incentive or obligation to step in to assist Gateway to ensure the continuation of the provision of social services; "the practical reality is that [Gateway] must recoup that money from somewhere." See Manders, 338 F.3d at 1327 ("If a significant adverse judgment occurs, both county and state funds are implicated because [defendant] would need to seek a greater total budget from the county for his office and a greater daily rate from the State[.]"). Here, a judgment rendered against Gateway would limit the State's ability to provide needed mental health and disability services. See Dkt. No. 79-2 at 19-20. Gateway would need to seek additional funds for its operating budget at the election of the state, and those funds would ultimately come from Georgia taxpayers. Id.

In the context of this particular case, this factor is close, for both sides have presented plausible arguments regarding ultimate responsibility for judgment. Nevertheless, even if Plaintiff were to prevail on this factor, it would not shift the overall calculus of the Manders factors in Plaintiff's favor. Considering all of the evidence, the Court finds that Gateway has satisfied its burden of demonstrating all four of the Manders factors. As such, the agency is an arm of the State.

### C. Whether Gateway Contracted Away Its Status as an Arm of the State

AO 72A
(Rev. 8/82)

Separate and apart from the Manders factors, Plaintiff argues that Gateway is not an arm of the State because it contractually agreed that its relationship with the State was that of an independent contractor. Dkt. No. 83 at 22. Plaintiff points to the Regional Contract entered into between the State of Georgia/DBHDD and Gateway, which states: "Nothing contained in this contract shall be construed to constitute [Gateway] or any of its employees, agents, or subcontractors as a partner, employee, or agent of [DBHDD], nor shall either party to this contract have any authority to bind the other in any respect, it being intended that each shall remain an independent contractor." Dkt. No. 79-5 at 4.

Plaintiff argues that, because DBHDD and Gateway entered into a contract which defined Gateway as a contractor for services, it, as a matter of law, cannot be an arm of the State (and, thus, it can be sued under § 1983). However, simply because Gateway and DBHDD entered into a contract which labels Gateway an independent contractor does not mean that, under the law, Gateway is indeed an independent contractor. As discussed above, whether an entity is an arm of the State is ultimately a question of federal law. Manders, 338 F.3d at 1309.

Moreover, countless employers have entered into independent contractor agreements with individuals only for a court to later determine that, under the law, the individuals are not independent

contractors but employees. See, e.g., Orton v. Masquerade, Inc., 716 S.E.2d 764, 766 (Ga. Ct. App. 2011) (stating the test to determine an independent contractor includes "whether the employer, under the contract . . . has the right to direct the time, the manner, the methods, and the means of the execution of the work, as contra-distinguished from the right to insist upon the contractor producing results according to the contract" or "[p]ut another way, the test is essentially whether the contractor has a bona fide existence apart from the employer or functions instead as the employer's alter ego").

Similarly, entities such as DBHDD often use form independent contractor agreements in their dealings with other entities to attempt to shield themselves from liability that might otherwise attach should the relationship of the parties be deemed one of, for example, employer and agent. Again, though, when determining the nature of the relationship between Gateway and DBHDD, it is not the contract which controls, but the reality of the relationship between the two. And, here, the Court has determined that, under the Manders factors, Gateway is an arm of the State of Georgia. Shands Teaching Hosp. & Clinics, Inc., 203 F.3d at 1311 (stating that the inquiry regarding an entity's status as an arm of the State "is not into the nature of a corporation's status in the abstract, but its function or role in a particular context,"

AO 72A
(Rev. 8/82)

i.e. "whether and to what extent [the entity is] contractually acting as [a] representative[] of the State").

Accordingly, Gateway is an arm of the State and, in turn, not subject to suit under 42 U.S.C. § 1983. Thus, the Court need not determine whether Gateway waived its Eleventh Amendment immunity because Gateway need not rely on the Eleventh Amendment to shield itself from this claim.[3] Plaintiff's § 1983 claim is **DISMISSED**.

### III. Plaintiff's Contract Claims

Plaintiff alleges that there was a contract between Quincy and Gateway in which Gateway agreed to provide Quincy with behavioral services.[4] Dkt. No. 1-3 ¶ 8. But Gateway asserts that the various administrative and treatment records cited by Plaintiff do not constitute a contract because they (1) do not contain all the necessary terms of a contract, and (2) are not signed contemporaneous writings. Dkt. No. 79-1 at 24. Moreover, Gateway alleges, Plaintiff's contract claims are barred by State sovereign immunity. Id. at 22.

---

[3] Because Gateway is not subject to suit under § 1983, the Court need not address Plaintiff's argument that Gateway waived its immunity by removing the case to this Court, dkt. no. 83 at 22, 23, or waived its immunity to the extent of its general liability insurance policy coverage, id. at 18-19.

[4] These documents include: Gateway's Regional Contract with DBHDD, Gateway's mission statement, Gateway's notice of "Consumer Rights," Plaintiff's Behavioral Support Plan, Plaintiff's treatment "Safety plan," Plaintiff's "Standard Room and Board" contract, "Commuting Transportation Agreement," "Consumer Responsibilities" statement, Plaintiff's "Mental Retardation Waiver Program – Freedom of Choice – (Statement of Informed Consent)," "Gateway Behavioral Health Services Policy Statement Number 9.2" relating to "Consumer Complaints and Rights of Appeals Process," Plaintiff's Consumer Consent to Treatment Form, Gateway's Consumer Handbook, and "Gateway Behavioral Health Services DD Orientation Checklist." See Dkt. Nos. 1-3, 79-3, 79-5, 83.

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." Va. Off. for Prot. & Advocacy v. Stewart, 563 U.S. 247, 253 (2011). Georgia waives sovereign immunity only for breaches of written contracts. See Ga. Const. art. I, § 2, ¶ IX ("The state's defense of sovereign immunity is hereby waived as to any action ex contractu for the breach of any written contract now existing or hereafter entered into by the state or its departments and agencies."). Plaintiff has the burden of establishing a written contract between the parties. Sherin v. Dep't of Human Res., 494 S.E.2d 518, 522 (Ga. Ct. App. 1997) ("[T]he party seeking to benefit from the waiver of sovereign immunity bears the burden of proof.").

The main document relied upon by Plaintiff for assigning contractual liability to Gateway is the Regional Contract between Gateway and DBHDD. Dkt. No. 79-5 at 4. Plaintiff argues that Quincy is a third-party beneficiary to the contract, wherein, according to Plaintiff, Gateway promised to "follow all policies of DBHDD," "keep Quincy free from abuse," "report each occurrence [of abuse] immediately," and hire no "felons or people with the background of Errol Wilkins." Dkt. No. 83 at 10-11, 13. Because Gateway breached its promises, Plaintiff argues, Gateway waived its sovereign immunity and can be held contractually liable to Quincy as a third-party beneficiary.

AO 72A
(Rev. 8/82)

In _Alverson v. Employees' Retirement System of Georgia_, the Georgia Court of Appeals describes two cases which this Court finds analogous to this case. The first is _Burton v. DeKalb County_, 434 S.E.2d 82 (Ga. Ct. App. 1993). There, the plaintiff was a state employee who slipped and fell in water that had accumulated in a building owned and maintained by DeKalb County under contract with the State. The plaintiff sued the county for injuries sustained. She sought to avoid the bar of sovereign immunity by arguing that she was suing the county for breach of its maintenance contract with the State. The Georgia Court of Appeals rejected the argument that plaintiff had standing to sue as a third-party beneficiary of the contract, holding that the action sounded in tort and was barred by sovereign immunity.

In the second case, _Merk v. DeKalb County_, 486 S.E.2d 66 (Ga. Ct. App. 1997), the plaintiff was a DeKalb County homeowner whose house was flooded by sewage. She also sued the county on a breach of contract theory, claiming that she and the county were parties to a written contract for water and sewer services established by county code. Concluding that the county code did not contain all the necessary terms of a contract, the Georgia Court of Appeals held that plaintiff's action, though couched in contract, actually sounded in tort and, like _Burton_, was barred by sovereign immunity.

AO 72A
(Rev. 8/82)

Here, Plaintiff's contract claim, like those of the plaintiffs in <u>Burton</u> and <u>Merk</u>, undeniably sounds in tort. The Complaint actually labels the claim as one for "*negligent* breach of a contract." Dkt. No. 1-3 at 14. The Complaint goes on to describe Gateway's alleged negligent (tort) actions, i.e. a failure to maintain a safe and secure environment, negligent hiring, negligent supervision, and battery. <u>Id.</u> ¶ 44. As such, the Court concludes that they share the fate of the tort claims previously dismissed by the Court, dkt. no. 25, and are barred by sovereign immunity. Accordingly, the Court **GRANTS** Gateway's summary judgment motion as to the contract claims.[5]

## CONCLUSION

Defendant Gateway's motion for summary judgment, dkt. no. 79, is **GRANTED** in its entirety—Plaintiff's § 1983 fails because Gateway is an arm of the State and not subject to suit thereunder, and Plaintiff's contract claims sound in tort and are thus barred by sovereign immunity. Gateway's motion to dismiss an indispensable party, dkt. no. 71, is **DENIED as moot**. There being no claims remaining in this case, the Clerk of Court is **DIRECTED** to close the case.

---

[5] The same analysis applies to the other "contracts" referenced by Plaintiff—her claims are couched in contract but sound in tort. Moreover, of the various documents referenced by Plaintiff, <u>see</u> dkt. no. 79-3, the only document that contains the four essential elements of a contract is the "Standard Room and Board" contract, <u>id.</u> at 13-14. However, the contract was for housing services, and Plaintiff has not alleged that Gateway breached any obligations it had under the contract to provide Quincy with housing. <u>See</u> Dkt. No. 1-3.

AO 72A
(Rev. 8/82)

**SO ORDERED,** this 28th day of November, 2018.


HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA